**SPH Associates LLC v. Zoning Board of Adjustment of the City of Philadelphia**

*Joseph Belles* for appellant.

*Cheryl L. Gaston* and *Stanley R. Krakower,* for appellees.

GLAZER, *J.*, October 13, 2006—

### FACTUAL AND PROCEDURAL HISTORY

This appeal arises from an order issued by the Zoning Board of Adjustment in calendar no. 05-0873, which refused the request for a certificate[1] for the property located at 446-50 North 6th Street in Philadelphia.

On May 23, 2005, Ronald J. Patterson, the agent for SPH Associates LLC (appellant), filed an application for a Zoning and/or Use Registration Permit with the Department of Licenses and Inspections (L&I) to modify and/

---

1. A "certificate" is equivalent to a "special exception."

or expand the existing use of the subject property as a restaurant and night club with live entertainment and dancing for use as an adult cabaret, as defined by section 14-1605 of the Philadelphia Code. (Findings of fact, ¶1.) On June 3, 2005, appellant's application was referred to the board, pursuant to section 14-1605(e) of the code, on the basis that the use of the subject property, as an adult cabaret, requires a certificate from the board. (Findings of fact, ¶2.) On June 9, 2005, appellant filed a petition of appeal of the referral to the board, arguing that: (1) literal enforcement of the Zoning Code would impose an unnecessary hardship upon the property; and (2) the proposed adult cabaret will cause no adverse impact upon the public health, safety and welfare, or traffic in the area. (Findings of fact, ¶3.) Appellant also requested variance relief and necessary use certificates and special use permits. (Findings of fact, ¶3.)

Public hearings were held before a quorum of board members on March 15, 2006, April 5, 2006 and April 28, 2006. Protestants included the Olde City Civic Association, Northern Liberties Neighborhood Association, Franklin Bridge North Civic Association, State Senator Vincent Fumo, State Representative Marie Lederer, Councilman Frank DiCicco, the Seaman's Church Institute, and a number of other neighboring businesses and residents who submitted letters of opposition.

The hearing on March 15, 2006 resulted in a continuance, with the board members suggesting that appellant meet with concerned civic associations. (Findings of fact, ¶¶5-9.)

The hearing resumed on April 5, 2006, during which the board heard testimony regarding appellant's applica-

tion for the certificate. (Findings of fact, ¶¶10, 12.) The board heard and considered testimony from several people, including Luke Lirot, Esquire, a member of the Florida Bar who was admitted pro hac vice to aid counsel for appellant. (Findings of fact, ¶13.) Mr. Lirot offered copies of the city zoning maps showing that the subject property is in the L-4 Industrial District and testified that appellant was seeking a certificate for a gentlemen's club. (Findings of fact, ¶13.) In addition, Mr. Lirot stated that the club is part of *Scores,* a national operation of men's clubs. (Findings of fact, ¶13.) Joseph Beller, Esquire, counsel for appellant, stated that the club would hire between 100 and 150 people, part-time and full-time; that the license of the bar would be in the name of the former business at the property, *Bash,* and *Scores* would be a licensee. (Findings of fact, ¶13; N.T. 4/05/06, pp. 14-21.) Other testimony was offered regarding the issues of security, traffic congestion and parking accommodation. (Findings of fact, ¶¶13-25.)

On April 28, 2006, the final portion of the hearing commenced. The board heard and considered testimony from various witnesses regarding the parking accommodations provided by appellant's club. (Findings of fact, ¶27.) Kevin Johnson, the president of Traffic Planning and Design Corporation, testified that he reviewed a report prepared by his company's employee regarding the subject property and that the report was accurate. (Findings of fact, ¶27.) Additionally, Mr. Beller provided a copy of a signed lease agreement which indicated that there would be three separate locations for parking: one location with 175 spaces; one location with 100 spaces; and one location with 50 spaces, for a total of 325 spaces. (Findings of fact, ¶30; N.T. 4/28/06, pp. 10-17.)

John Neilson, an employee of *Scores* Holding Company, the licensor of *Scores'* trademarks, testified that the premises would have seating for 385 people and some standing room; on the first floor, there would be seating for 285 people; and the basement would be used for private parties with seating for 100 people. (Findings of fact, ¶32; N.T. 4/28/06, pp. 43-48.) Mr. Neilson estimated that the club would reach full capacity only once or twice a week; the average number of patrons would be between 150 and 175 people. (Findings of fact, ¶32; N.T. 4/28/06, pp. 43-48.)

While the premises is located in an industrial district, the board noted that residential properties are nearby and that some of the parking lots the club wanted to utilize are in residential districts. (Findings of fact, ¶35; N.T. 4/28/06, pp. 61, 65-66.) In addition, the board heard and considered testimony provided by Alex Generalis, a real estate developer and broker, who is developing 444 North 4th Street, a block and a half from the subject property. (Findings of fact, ¶42; N.T 4/28/06, pp. 131-35.) He testified that he will propose a large residential development project on 2nd and Callowhill Streets and is also planning developments at 460 North 4th Street and 4th and Spring Garden Streets. (Findings of fact, ¶42; N.T 4/28/06, pp. 131-35.)

The board heard a considerable amount of testimony concerning the impact on the public health, safety, and welfare. (Findings of fact, ¶¶36-38, 47-48, 50-51, 53.) In particular, the board considered testimony from representatives of the intervenors—Matthew Ruben (president of the Board of Directors of the Northern Liberties Association) and Reverend James Von Dreele (executive

director and CEO of the Seamen's Church Institute). Mr. Ruben testified that it was his opinion that a gentlemen's club could (1) endanger residential development and the pedestrian linkage with surrounding areas; (2) that three valet lots would cause traffic problems in the area; and (3) due to prior incidents at the previous club, there were similar concerns about the new club. (Findings of fact, ¶48; N.T. 4/28/06, pp. 168-70, 190.)

Reverend Von Dreele testified that a gentlemen's club would degrade, and not enhance, the community. (Findings of fact, ¶53; N.T. 4/28/06, pp. 214-23.) According to Reverend Von Dreele, Seamen's Church will have a chapel in the first floor[2] and has about 15,000 visitors a year, many of whom are directed to the historical district, and go there by car or on foot; children who frequent the two nearby facilities would have to walk by the club. (Findings of fact, ¶53; N.T. 4/28/06, pp. 214-23.)

Dr. Anne Layden Ph.D., director of the Sexual Trauma and Psychopathology program at the University of Pennsylvania, also testified before the board. She has conducted research on the impact of strip clubs in Philadelphia. (Findings of fact, ¶50; N.T. 4/28/06, pp. 195-205.) A poll conducted by Dr. Layden in Pennsylvania among chiefs of police concluded that clubs, such as *Scores*, increased crime, and specifically, according to Dr. Layden, that the clubs increased rapes, prostitution, and sex trafficking. (Findings of fact, ¶¶50-51; N.T. 4/28/06, pp. 195-205.)

---

2. Seamen's Church was granted a variance to build a chapel in its facility and has invested $4,000,000 in the facility. (Findings of fact, ¶53; N.T. 4/28/06, pp. 214-23.)

On cross-examination, Dr. Layden also testified that she conducted a survey based upon interviews of 81 people who go to strip clubs and who are likely to be rapists. (Finding of fact, ¶51; N.T. 4/28/06, pp. 207-208.) She stated that the interviewees were not her patients and that their crimes had gone unreported. (N.T. 4/28/06, pp. 207-208.) Dr. Layden testified that she could not confirm whether the interviewees told her the truth. (N.T. 4/28/06, p. 208.)

The board voted to refuse to grant a certificate, and on May 9, 2006, issued a notice of decision refusing the request for a certificate. (Findings of fact, ¶61.) In rendering its decision, the board applied section 14-1605(e) of the Philadelphia Zoning Code, which provides that a cabaret, as defined in section 14-1605(2), shall not be permitted within L-4, L-5, and G-2 Industrial Districts, unless a Zoning Board of Adjustment certificate is obtained. (Conclusions of law, ¶2.) The board considered appellant's request for a certificate pursuant to the criteria set forth in section 14-1804 of the code. (Conclusions of law, ¶3.) The party requesting the certificate bears the initial burden of proof concerning the specific requirements in section 14-1804, *i.e.,* traffic congestion, fire and safety, overcrowding, impairment to light and air, burden on public facilities, and effect on redevelopment or comprehensive plan. (Conclusions of law, ¶3; see also, *In re Appeal of the Estate of Achey,* 86 Pa. Commw. 385, 484 A.2d 874 (1984), *aff'd,* 509 Pa. 163, 501 A.2d 249 (1985); *Bray v. Zoning Board of Adjustment,* 48 Pa. Commw. 523, 410 A.2d 909 (1980).

The board concluded that appellant did not meet its burden of proof that the proposed use met the criteria set

forth in section 14-1804, stating: "(1) the applicant's traffic study did not adequately address the lack of parking for the patrons of the proposed club, nor the concerns of traffic congestion in the area because of the presence of numerous other clubs and/or businesses which place a burden on traffic and parking. Applicant's proposed solution to the lack of parking was a valet service but there was no provision for adequate parking for patrons who would not use the valet service; (2) the evidence was that the club would have the capacity for 385 people but only have 325 valet parking spaces; (3) applicant did not present any evidence, other than the argument of an attorney representing *Scores*, that the proposed use would not endanger the public safety; (4) although the applicant represented that a local person with security expertise might be hired, there was no guarantee that there would be such a hire or that the security would be adequate; (5) applicant failed to present sufficient evidence that the proposed use would not adversely affect the area redevelopment plan; in fact, the overwhelming evidence before the Zoning Board of Adjustment was that the proposed use would have a deleterious effect on the surrounding area, including planned residential and commercial development." (Conclusions of law, ¶4.)

SPH Associates LLC subsequently filed an appeal to this court from the refusal of the board to grant the certificate regarding the subject property.

## DISCUSSION

Where an appeal is taken from the decision of a zoning board, and where the lower court has not held a hearing

de novo, this court's scope of appellate review is limited to a determination of whether the zoning board has committed (1) a manifest abuse of discretion; (2) an error of law; or (3) made findings of fact that were not supported by substantial evidence of record. *Whitpain Township Board of Supervisors v. Whitpain Township Zoning Hearing Board,* 121 Pa. Commw. 418, 432, 550 A.2d 1355, 1362 (1988), *appeal denied,* 525 Pa. 639, 578 A.2d 932 (1990); *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 555, 462 A.2d 637, 639-40 (1983). The board will have abused its discretion only if this court concludes that the board made findings not supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Valley View, supra* at 555, 462 A.2d at 640. As this court sits as an intermediate court, it must affirm the board's decision unless the court finds that (1) the adjudication was in violation of the constitutional rights of the appellant; (2) the adjudication was not in accordance with the law; (3) the board violated the practice and procedure of Commonwealth agencies; or (4) any finding of fact made by the board, and necessary to support its adjudication, was not supported by substantial evidence. 2 Pa.C.S. §754(b); *Sparacino v. Zoning Board of Adjustment,* 728 A.2d 445, 447 (Pa. Commw. 1999)

While appellant contends that the board abused its discretion, it is clear from the record before this court that there was more than substantial evidence to support the board's decision to deny the certificate. The certificate which appellant seeks is a permitted use subject to the

board's review and approval. The board's findings of fact and conclusions of law are contained in a 19-page document that summarizes the three hearings regarding appellant's request for a certificate. There are 338 pages of transcript testimony and additional exhibits. Furthermore, this court may not substitute its own judgment for that of the board. The board is only required to set forth sufficient facts and reasons to show that its actions are not arbitrary. See *Lindquist Appeal* 364 Pa. 561, 566, 73 A.2d 378, 380-81 (1950).

The certificate which appellant sought from the board is a permitted use subject to the board's review and approval. According to section 14-1804 of the Zoning Code, there are certain criteria that the applicant must meet in order to obtain the desired certificate. The applicant bears the *initial burden of proof* regarding the specific criteria set forth in section 14-1804 of the code, *i.e.,* traffic congestion, fire and safety, overcrowding, impairment to light and air, burden on public facilities, and effect on redevelopment or comprehensive plan. See *Bray v. Zoning Board of Adjustment, supra.* The protestants bear the same burden of proof regarding the non-specific or general criteria in section 14-1804, *i.e.,* adverse effect on public health, safety or welfare, and harmony with the spirit and purpose of the Zoning Code.

In this case, the board concluded that appellant had not sustained its burden of proof that the proposed use met the criteria set forth in section 14-1804 based upon the following: (1) lack of proper parking facilities to meet the capacity of the club; (2) concern for public safety; (3) inadequate security; and (4) adverse impact on the area redevelopment plan.

## 1. *Traffic and Parking*

The zoning board shall consider "that the grant of the certificate will not substantially increase congestion in the public streets." Philadelphia Zoning Code §14-1804(1)(a). Objectors to the proposed use must show a high probability that the use will generate traffic patterns not normally generated by this type of use and that the abnormal traffic will pose a substantial threat to the health and safety of the community. *Manor Healthcare Corporation v. Lower Moreland Township Zoning Hearing Board,* 139 Pa. Commw. 206, 217, 590 A.2d 65, 71 (1991); see also, *In re Appeal of Martin,* 108 Pa. Commw. 107, 529 A.2d 582 (1987); *Appeal of O'Hara,* 389 Pa. 35, 131 A.2d 587 (1957).

Appellant presented testimony from John Wichner, a traffic planner and engineer employed by the firm of Traffic Planning and Design in Pottstown. (Findings of fact, ¶21.) Mr. Wichner stated that he did traffic counts at the subject premises between Friday at 4 p.m. through Sunday at noon, by personal observation and automatic traffic recorders at the busiest hours. (Findings of fact, ¶21; N.T. 4/28/06, pp. 61-77.) He added the statistics from the Institute of Transportation Engineers for traffic data for similar facilities as the proposed club, and concluded that North 6th Street would be able to acceptably handle the traffic with the new club. (Findings of fact, ¶21; N.T. 4/28/06, pp. 61-77.) On-site, there are between 10 and 12 usable parking spots and there is an agreement with the adjacent property owner for use of another 65 spaces. (Findings of fact, ¶21.) There are parking spaces on the street and nearby paid parking lots, in addition to appellant's proposed valet service. (Findings of fact, ¶21.)

Although appellant presented witnesses who testified that *Scores* would provide adequate parking, the board also considered the problems with appellant's plan. Mr. Stanley Krakower, Esquire, counsel for the Olde City Civic Association and the Northern Liberties Association, noted that the parking plan outlined by Mr. Neilson relies heavily on valet service and there is not enough parking for persons who do not want to use the valet service. (Findings of fact, ¶33; N.T. 4/28/06, pp. 49-55.) Mr. Krakower's point was supported by the testimony of Richard Tomm, an expert land use planner, former chair of Olde City Civic Association and member of Franklin Bridge North Civic Association. Mr. Tomm stated that reliance on valet service alone presents a problem. (N.T. 4/28/06, pp. 147-49.)

Mitch Deighen, former president of Northern Liberties Neighborhood Association and a long-time area resident, testified that when other clubs are in operation, there is a significant amount of traffic in the same area as the proposed *Scores*. (N.T. 4/28/06, pp. 223-35.)

As the fact-finder, the board made credibility determinations based on the testimony provided. It concluded, based upon substantial evidence, that appellant had not met its burden to satisfy the burden regarding parking congestion.

## 2. *Security and Public Safety*

The board concluded that appellant did not present evidence that the proposed use would not endanger the public safety, and that there was no guarantee that there would be an adequate security presence at the club.

*Scores'* witness, Luke Lirot, Esquire, offered materials concerning the criteria for the granting of certificates and studies regarding the impact of gentlemen's clubs on the public health, safety and welfare. (Findings of fact, ¶36; N.T. 4/28/06, pp. 68-102.) Appellant's counsel argued that places like *Scores* do not create any increase in crime and have absolutely no negative impact on property values and do not create blight. (Findings of fact, ¶36; N.T. 4/28/06, pp. 68-102.) Based on the studies Mr. Lirot offered, he stated that he was of the opinion that adult businesses would not cause a problem and would not adversely affect other development in the area. (Findings of fact, ¶36; N.T. 4/28/06, pp. 68-102.) Mr. Lirot offered three notebooks into evidence which contained studies from cities from various U.S. cities. (Findings of fact, ¶36; N.T. 4/28/06, p. 79.)[3] Mr. Lirot conceded, however,

---

3. The board questioned Mr. Lirot as to the relevance and admissibility of studies from various U.S. cities. (N.T. 4/28/06, pp. 79-102.) Mr. Lirot asserted that appellant was not required to conduct a study specific to Philadelphia because courts have held that "you can look at foreign experience because people are people." (N.T. 4/28/06, p. 96.) The studies submitted by Mr. Lirot would be admissible under 2 Pa.C.S. §554, which provides that "Local agencies shall not be bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonable probative value may be received." While the materials were admissible, they were certainly not determinative of whether *Scores* would increase crime in Philadelphia, negatively affect area property values, or create blight. Moreover, the issues of the weight and credibility of the witness and the studies were matters for the board to assess. See *Borough of Youngsville v. Zoning Board of Borough of Youngsville,* 69 Pa. Commw. 282, 287, 450 A.2d 1086, 1089 (1982); *Center City Residents Association v. Zoning Board of Adjustment,* 48 Pa. Commw. 416, 418, 410 A.2d 374, 375 (1980). The board, as factfinder, has the power to reject even uncontradicted testimony which it finds to lack credibility. *Vanguard Cellular Systems Inc. v. Zoning*

that he only presented studies concerning areas where *Scores* is in litigation, that no local studies had been conducted, and that studies concerning a *Scores* location in New York were not included in the materials submitted to the board. (N.T. 4/28/06, pp. 88-92, 99-102.)

*Scores* Holding Company employee, John Neilson, offered testimony that *Scores* will retain a former Philadelphia police officer (if one can be located), who will be trained by a company called Forensic Investigative Associates (FIA). (N.T. 4/05/06, p. 46.) The security person would remain in Philadelphia and *Scores* would be liable for security problems. (Findings of fact, ¶19; N.T. 4/05/06, pp. 49-54.) Mr. Gutstein, an employee of FIA, testified that FIA would be retained to oversee the development and implementation of the security policies, procedures and protocols and the training and hiring of security staff. (N.T. 4/05/06, p. 46.)

There was also testimony, however, by Sebastian Hansen, the owner of *Bash* (which was located where appellant proposes *Scores* will be), who stated that there was a shooting inside of *Bash*. (Findings of fact, ¶14; N.T. 4/05/06, pp. 22-24.) The club was subsequently closed. (Findings of fact, ¶14; N.T. 4/05/06, pp. 22-24.)

The board additionally heard and considered the testimony of Dr. Anne Layden Ph.D. concerning her views of the impact of the proposed club on the general public,

---

*Hearing Board of Smithfield Township,* 130 Pa. Commw. 371, 380, 568 A.2d 703, 707 (1989); *George v. Zoning Hearing Board of Upper Moreland Township,* 39 Pa. Commw. 472, 474, 396 A.2d 478, 479 (1978).

as well as the patrons and employees. (N.T. 4/28/06, pp. 194-210.)

The Notes of Testimony indicate that the board heard ample testimony regarding the adverse effect of the proposed club on the health, safety and welfare of the public. The board obviously found certain witnesses to be more credible than other witnesses, determinations which this court may not revisit. Therefore, this court concludes that the board's credibility determinations regarding health, safety and welfare issues were supported by substantial evidence.

### 3. *Effect on Future Development*

The board concluded that appellant failed to show that the proposed use would not have a deleterious effect on the surrounding area, including planned residential and commercial development. (Conclusions of law, ¶4.) Although unsubstantiated prophecies based on the opinion of the board itself will not adequately support conclusions of law, the board heard and considered testimony from several witnesses, whom they found to be credible, who testified that *Scores* would have a negative effect on surrounding area development. See *Van Sciver v. Zoning Board of Adjustment of Philadelphia,* 396 Pa. 646, 655, 152 A.2d 717, 723 (1959).

Appellant's club is located in an L-4 Industrial District. (Findings of fact, ¶¶2, 34-35.) A textile factory is located on the same block as appellant's proposed club. (Findings of fact, ¶49.) Aerial photographs and zoning maps show that there are industrial districts to the east and west. Low highway overpasses, access streets, and ramps accommodating the Vine Street Expressway, I-95,

and the Benjamin Franklin Bridge are located to the south of appellant's proposed club. (Findings of fact, ¶35; N.T. 4/28/06, p. 61.)

Richard Tomm (an architect), Mr. Ruben, Rev. Von Dreele, Rick Snyderman (founder of South Street Renaissance and a resident and business owner in Olde City), and Mr. Gregorski (from the City Planning Commission) all testified that they believed the proposed use would have a negative effect on future development. Councilman Frank DiCicco testified that other adult establishment facilities in his district did have parking on the premises. (Findings of fact, ¶39; N.T. 4/28/06, pp. 116-20.) According to Councilman DiCicco, adult entertainment facilities do have negative impacts on future development and that there are four real estate developments "in the pipeline" in the area where *Scores* wants to locate and that the club will bring these proposed projects to a halt. (Findings of fact, ¶39; N.T. 4/28/06, pp. 116-20.) Councilman DiCicco further testified that he had introduced an overlay in December 2005 that would prohibit any new adult entertainment facility in this area; this bill was unanimously passed by city council. (Findings of fact, ¶41; N.T. 4/28/06, pp. 123-29.)

The board set forth sufficient facts and reasons to show that its actions were not arbitrary. Therefore, this court denies the instant appeal and affirms the decision of the board.

## ORDER

And now, October 13, 2006, it is hereby ordered that the appeal of SPH Associates LLC is denied and the decision of the zoning board of adjustment is affirmed.